EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

IN THE MATTER OF THE SEARCH OF:

Information, including the content of communications, associated with the Facebook account assigned the Facebook User ID ▮▮▮▮▮▮▮▮▮▮ that is stored at the premises controlled by Meta Platforms, Inc.

Case No. 2:23-mj-661

Magistrate Judge: Deavers

UNDER SEAL

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Brandon L. Harmon, Task Force Agent, United States Department of Homeland Security Investigations (HSI), being duly sworn, depose and state that:

### EDUCATION, TRAINING, AND EXPERIENCE

1. I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2. I am a Task Force Agent with HSI assigned to the Office of the Assistant Special Agent in Charge, Columbus, Ohio. I am currently assigned to the Central Ohio Human Trafficking Task Force (COHTTF). I am also a Detective with the Columbus, Ohio Division of Police (CPD). CPD has employed me since December of 2005. As a Task Force Agent, my responsibilities and duties include the investigation and enforcement of federal laws and regulations related to customs and immigration violations, including but not limited to narcotics, financial crimes, fraud, human trafficking, and violations of the Immigration and Nationality Act. During my tenure as a Task Force Agent, I have participated in State and Federal investigations involving the illegal possession of firearms and narcotics in conjunction with human trafficking and prostitution, human trafficking, and narcotics trafficking.

3. I have participated in the execution of search warrants and arrests related to the above-referenced offenses. I have seized or assisted in seizing contraband and evidence, including currency, narcotics, firearms, and documentary evidence, which includes electronically stored documents. I have had formal and on-the-job training in matters involving human trafficking and narcotics trafficking from instructors, supervisors, and colleagues. I have been personally involved in investigations concerning the possession, manufacture, transportation, distribution, and importation of controlled substances, as well as methods used to finance drug transactions. I am knowledgeable in the enforcement of state and federal laws pertaining to narcotics and dangerous drugs.

4. By virtue of my experience and training, your affiant is familiar with money laundering techniques utilized by individuals involved in illegal activities, such a narcotics and human trafficking. Your affiant knows that it is common for people involved in these types of illegal activities to accumulate large sums of U.S. currency that they seek to launder in order to avoid detection of their illegal activities, and to attempt to freely spend the cash without drawing law enforcement scrutiny. As a result of my training and experience, I am familiar with how drug trafficking organizations illegally traffic, transport, and distribute narcotics and the proceeds derived from the distribution of narcotics. Throughout this affidavit, reference to "investigators" specifically refers to criminal investigators.

5. Based on my training and experience as a law enforcement officer, I also know that members of drug trafficking organizations (DTO) depend on communicating with each other for the purpose of successfully trafficking narcotics. I understand that international and domestic telephone communications are vital to members of a global drug trafficking organization to successfully coordinate and organize the smuggling, transportation, and distribution of illegal narcotics to the United States. Domestic and international drug traffickers depend on telephone communications to cryptically discuss their illegal activities. International telephone communications allow narcotics traffickers to maintain contact with drug associates, drug suppliers, and drug customers operating in different countries. Cellular telephone texts and other electronic messaging also enable drug trafficking organizations to maintain contact with the associates, drug suppliers, and customers. The telephonic electronic communications are often rapidly followed by telephonic contact with the individual signaling the electronic message. Drug

trafficking organizations frequently use cellular electronic messaging features to communicate with associates relating to the logistics of their drug trafficking business. I am also aware that many drug trafficking organizations utilize cellular telephones as an electronic means of communication in an effort to clandestinely communicate without law enforcement interception.

6. Through instruction, training, and participation in investigations, I have become familiar with the manner and methods by which narcotics traffickers and sex traffickers conduct their illegal business and the language and terms that are used to disguise conversations about their narcotics activities. From experience and training, I have learned that drug traffickers believe their conversations are susceptible to interception and rarely overtly discuss their illegal activities. Instead, to conceal the true nature of their illegal activities and to avoid detection by law enforcement, drug traffickers use coded words and phrases to describe narcotics, currency, and locations. Moreover, narcotics traffickers and sex traffickers frequently use telephone communications to further their illegal activities by, among other things, remaining in constant communication with one another, either verbally or via text messaging.

7. I am also aware that drug traffickers and sex trafficking organizations utilize pre-paid telephones with a direct connect (DC) feature that have either no subscriber listed, or a bogus subscriber listed. I am aware that those involved in illegal drug operations often list their telephone and cellular telephones in the names of others or in fictitious names to conceal their identities for illegal purposes, and to thwart law enforcement detection and prosecution. It is likewise essential that such organized groups meet to formulate plans concerning narcotics or other illegal activities, and to divide their illegal proceeds. I am also aware that drug traffickers and sex traffickers often utilize more than one communication device at one time in order to facilitate their drug trafficking activities. Through my employment as a law enforcement officer, I have gained knowledge in the use of various investigative techniques including the use of judicially-authorized Title III intercepts, physical surveillance, undercover agents, confidential informants, cooperating witnesses, the controlled purchases of illegal narcotics, electronic surveillance, consensually-monitored recordings, investigative interviews, trash pulls, financial investigations, the service of administrative and grand jury subpoenas, and the execution of search and arrest warrants.

8. As a Task Force Agent, I am authorized to investigate violations of the laws of the United States and to execute warrants issued under the authority of the United States.

3

## PURPOSE OF THE AFFIDAVIT

9. I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook via Meta Platforms, Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in **Attachment A**. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, including the content of communications, pertaining to the Facebook account for ▉▉▉▉ which has an associated Facebook User ID ▉▉▉▉ (hereinafter the **SUBJECT ACCOUNT**).

10. The facts and statements set forth in this affidavit are based on my knowledge, experience, and investigation, as well as the knowledge, experience, and investigative findings of others with whom I have had communications about this investigation, including other law enforcement officers and agents. Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts I believe are necessary to establish probable cause for a search warrant for **SUBJECT ACCOUNT**, belonging to ▉▉▉▉ I have not omitted any facts that would negate probable cause.

11. The **SUBJECT ACCOUNT** to be searched is more particularly described in Attachment A, for the items specified in Attachment B, which items constitute instrumentalities, fruits, and evidence of violations of A) the distribution and possession with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 841(a)(1); (B) sex trafficking by means of force, threats, fraud, or coercion, in violation of Title 18, United States Code, Sections 1591(a); and (C) conspiracy to commit sex trafficking, in violation of Title 18, United States Code, Section 1594; (hereinafter collectively referred to as the **TARGET OFFENSES**. I am requesting authority to search the **SUBJECT ACCOUNT**, wherein the items specified in Attachment B may be found, and to seize all items listed in Attachment B as instrumentalities, fruits, and evidence of crime.

12.     The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, see 18 U.S.C. § 2711(3)(A)(i).

## APPLICABLE STATUTES AND DEFINITIONS

13.     Title 18, United States Code § 1591 makes it a federal crime for any person, in or affecting interstate or foreign commerce to recruit, entice, harbor, transport, provide, obtain, advertise, maintain, patronize or solicit, by any means, a person, knowing, or in reckless disregard of the fact that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act. Section 1594 of the same title prohibits attempts or conspiracies to engage in such acts.

14.     Title 21, United States Code, Section 841 makes it a federal crime for any person to knowingly or intentionally manufacture, distribute, or dispense, or possess with intent to manufacture, distribute or dispense a controlled substance.

15.     The term "computer"[1] is defined in Title 18 U.S.C. § 1030(e)(1) as an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.

16.     The terms "records", documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (such as writings), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (such as printing or typing) or electrical, electronic or magnetic form (such as any and all digital data files and printouts or readouts from any magnetic, electrical, or electronic storage device).

17.     Cellular telephone" or "cell phone" means a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through

---

[1] The term "computer" is used throughout this affidavit to refer not only to traditional laptop and desktop computers, but also to internet-capable devices such as cellular phones and tablets. Where the capabilities of these devices differ from that of a traditional computer, they are discussed separately and distinctly.

networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving videos; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may include geographic information indicating where the cell phone was at particular times.

18. "Internet Service Providers" (ISPs), used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet, web hosting, email, remote storage, and co-location of computers and other communications equipment.

19. "Internet Protocol address" (IP address), as used herein, is a code made up of numbers separated by dots that identifies particular computer on the Internet. Every computer requires an IP address to connect to the Internet. IP addresses can be dynamic, meaning that the ISP assigns a different unique number to a computer every time it accesses the Internet. IP addresses might also be static, if an ISP assigns a user's computer a particular IP address which is used each time the computer accesses the Internet.

**BACKGROUND INFORMATION CONCERNING SOCIAL MEDIA AND FACEBOOK**

20. Through my training and experience, I have learned that Facebook, via Meta Platform Inc., (hereinafter referred to as "Facebook") owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

21. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical

6

address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

22. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

23. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

24. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

25. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a

7

user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

26. Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

27. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

28. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

29. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

30. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

31. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

32. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a

Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

33. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

34. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

35. For the reasons described above, information stored in connection with the **SUBJECT ACCOUNT** may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated

9

with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

36. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INVESTIGATION AND PROBABLE CAUSE

37. On or about April 8, 2023, a Columbus Division of Police (CPD) officer encountered a cooperative source (herein identified as CS#1) who advised that an individual that goes by the street name ▮▮▮▮ is trafficking drugs and women. CS#1 indicated that ▮▮▮▮ was primarily operating his criminal activity on the west-side of Columbus, Ohio. CPD was familiar with the individual CS#1 identified as ▮▮▮▮ from prior law enforcement interactions. More specifically, ▮▮▮▮ was known to law enforcement as ▮▮▮▮ DOB: ▮▮▮▮ and his drug activities on the west-side of Columbus had been documented by CPD. For example, on or about April 6, 2023, CPD officers executed a search warrant at 390 Clarendon Avenue in Columbus, Ohio, a residence previously associated with ▮▮▮▮ and recovered at that search warrant were approximately three firearms and numerous suspected narcotics to include crack cocaine, powder cocaine and fentanyl were seized. CS#1 further informed CPD that he/she has been purchasing crack cocaine from ▮▮▮▮ for approximately two to three years. CS#1 stated that during that time frame, he/she knows

▇▇▇▇▇▇ to facilitate the posting of online sex advertisements of several women, and that the women then engage in commercial sex acts for profit as a result of these advertisements. CS#1 specifically named two adult females that were currently being promoted for prostitution at the direction of ▇▇▇▇▇▇ CS#1 stated that ▇▇▇▇▇▇ will control the money that is earned from these prostitution services and will provide the women with illegal drugs in order for them to continue to engage in the prostitution activities.

38. In or about June 2023, United States Postal Inspectors and Central Ohio High Intensity Drug Trafficking Area (HIDTA) Task Force Officers in Columbus, Ohio initiated a drug trafficking investigation after identifying a pattern of suspicious USPS Priority Mail Express parcels originating in Metro Phoenix Arizona and destined for addresses in Columbus, Ohio. Throughout this investigation, federal agents identified ▇▇▇▇▇▇ as the recipient of those packages which included kilogram amounts of fentanyl that was being distributed from a source of supply in Phoenix, Arizona. In addition, legal process that had been served during the course of the investigation revealed that ▇▇▇▇▇▇ had also actively tracking the parcels of drugs being shipped to him and picking up those packages upon their arrival to various west-side location in Columbus. Additionally, federal agents believed ▇▇▇▇▇▇ was receiving the bulk illegal narcotics through the mail and then redistributing the fentanyl to street level users in the Columbus, Ohio area. For example, throughout the course of that investigation, United States Postal Inspectors tracked packages containing fentanyl to the residence of 334 South Burges Avenue Columbus, Ohio. The address of 334 S. Burgess Avenue was attributed to ▇▇▇▇▇▇ through surveillance methods which observed ▇▇▇▇▇▇ receiving the packages. On or about September 28, 2023, law enforcement observed ▇▇▇▇▇▇ place numerous bags of trash in a container outside the address. A trash pull that same day resulted in the recovery of, among other things, used latex gloves and one baggie of a white powder/white rock-like substance further corroborating the fact that ▇▇▇▇▇▇ was likely redistributing the fentanyl.

39. On October 13, 2023, the Central Ohio High Intensity Drug Trafficking Area (HIDTA) Task Force executed a federal search warrant at 334 South Burgess Avenue in Columbus, Ohio. This address was known by law enforcement to be a location used by ▇▇▇▇▇▇ to receive parcels of drugs in the mail. Entry into the residence was made by the

11

Columbus Ohio Division of Police "INTAC" unit. Upon execution of the search warrant, five individuals, including ▮▮▮▮▮ were encountered in the residence and detained.

40. During the search of the residence, items indicative of the manufacturing and distribution of controlled substances were found, including, but not limited to: approximately 500 grams of a pressed white powder inside a vacuum sealed bag, digital scales, a loaded AR-15-style rifle, baggies full of white powder, a loaded Glock handgun, approximately $2,417.00 in a duffle bag, numerous cell phones, numerous Naloxone packages, and fentanyl test strips. Additionally, during the search of the residence, investigators discovered two makeshift rooms in the basement. These rooms were secured shut by a padlock and hasp from the outside of the room. Inside of these rooms were personal items utilized primarily by females. Through training and experience, your affiant is familiar that sex traffickers will use locks in this manner with the intention of keeping someone contained within an area against their will.

41. The federal search warrant obtained for the residence of 334 S. Burgess Avenue also encompassed the search, seizure, and forensic review of any cellular devices recovered from inside the residence. A total of five digital media devices were seized accordingly. Once the devices were seized, the CPD Digital Forensics Unit (DFU) preformed a forensic extraction on the cellular devices to export the data to a Cellebrite Report from each individual phone.

42. Your affiant began the review of the Cellebrite report attributed to a teal Cricket cellular phone with an associated IMSI number of 31015075950936 07, belonging to ▮▮▮▮ ▮▮▮▮ ▮▮▮▮ was one of the individuals who was located in the basement of 334 South Burgess at the time the search warrant was executed. Contained within the Cricket cellular phone Cellebrite report, specifically in the "User Account Information", your affiant identified several social media applications, banking applications and email accounts associated with ▮▮▮▮ ▮▮▮▮.

43. While reviewing the Cellebrite report for the Cricket cellular phone for evidence related to the drug trafficking crimes encompassed in the original federal search warrant, your affiant noted potential evidence of crimes related to sex trafficking or conspiracy to commit sex trafficking. More specifically, your affiant observed messages between ▮▮▮▮ and other unknown individuals who appeared to be purchasing sex. In these messages observed by your affiant, ▮▮▮▮ was arranging meetings with individuals to engage in sex with them through what

12

appeared to be online internet escort advertisements. Your affiant also observed images stored within the device which depict partially clothed to fully naked women posing in sexually provocative positions. Your affiant is familiar with images like these and through training and experience, know that such images are often posted on the internet as advertisements to engage in commercial sex acts. These images depicted Braham and other women not known to your affiant at this time.

44. Upon further review of the Cellebrite report for Cricket cellular phone, your affiant noted that a Facebook Messenger account was installed on the phone under the username ▓▓▓▓▓▓▓▓▓▓ (the **SUBJECT ACCOUNT**). In a brief review of these Facebook Messenger chats contained within the device, similar messages were observed to those noted above. More specifically, these messages mirrored what was noted in the text messages in which Braham appeared to also be utilizing Facebook Messenger to arrange meetings for the purpose of engaging in commercial sex acts via the use of online escort advertisements.

45. Based upon the conduct of individuals involved in prostitution such as ▓▓▓▓ ▓▓▓▓ in conjunction with the information provided by CS#1 and the drug trafficking activities of ▓▓▓▓▓▓ outline above as well as your affiant's training and experience, your affiant has reason to believe that females, such as ▓▓▓▓▓▓▓▓ may have been engaging in sex acts with individuals in exchange for money from which ▓▓▓▓▓▓ profited and that she and others may have been engaging in such activities by means of force, fraud and coercion due to the drugs recovered at the Burgess residence as well as the locks on the outside of the doors of the rooms in the basement of the residence.

46. In addition, based on my training and experience and information learned from other investigators and investigations, your affiant knows that Facebook is a common way for criminals to communicate, including for purposes of arranging narcotics transactions and conducting commercial sex acts. Your affiant is also aware that Facebook Messenger is a platform for that some traffickers utilize to communicate, manage, lure and entice potential vulnerable victims into crimes of sex and drug trafficking. In addition, the investigation has revealed that ▓▓▓▓ was with ▓▓▓▓▓▓▓▓ at the time of his arrest and likely utilized the **SUBJECT ACCOUNT** at a time when she was with him, and therefore, it contains evidence of the **TARGET OFFENSES**.

13

47. Your affiant therefore submits that there is probable cause to believe the evidence of violations of Title 18 United States Code §§ 1591 and 1594 (Sex Trafficking by Force, Fraud or Coercion and Conspiracy to Commit Sex Trafficking) will be located on the **SUBJECT DEVICE**.

## CONCLUSION

48. Based on the foregoing, there is probable cause to believe that the federal criminal statutes cited herein have been violated, and that the contraband, property, evidence, fruits and instrumentalities of these offenses, are located on/in the **SUBJECT ACCOUNT**. Therefore, I respectfully request that this Court issue search warrants for the location described in Attachment A, authorizing the seizure and search of the items described in Attachment B.

49. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. Furthermore, because the warrant will be served on Facebook via Meta Platforms, Inc., who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

Brandon Harmon
Task Force Agent
Homeland Security Investigations

Subscribed and sworn to before me on November 27, 2023

Elizabeth A. Preston Deavers
United States Magistrate Judge

14

## ATTACHMENT A

## PROPERTY TO BE SEARCHED

This warrant applies to information, including the content of communications, associated with the following Facebook account:

- Facebook account ███████████ which has an associated **Facebook User ID of** ███████████

that is stored at premises owned, maintained, controlled, or operated by Meta Platform, Inc., a company headquartered in Menlo Park, California.

## ATTACHMENT B

### PROPERTY TO BE SEIZED

I. **Information to be disclosed by Facebook:**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook via Meta Platform, Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government, for the time period of April 2023- November 2023, the Facebook user ID listed in **Attachment A**:

   a. All contact and personal identifying information, including: full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

   b. All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

   c. All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

   d. All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event po stings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

   e. All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

2

f. All other records and contents of communications and messages made or received by the user, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

g. All "check ins" and other location information;

h. All IP logs, including all records of the IP addresses that logged into the account;

i. All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

j. All information about the Facebook pages that the account is or was a "fan" of;

k. All past and present lists of friends created by the account;

l. All records of Facebook searches performed by the account;

m. All information about the user's access and use of Facebook Marketplace;

n. The types of service utilized by the user;

o. The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

p. All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

q. All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government within 10 days of receipt of this warrant.

II.     Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of A) the distribution and possession with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 841(a)(1); (B) sex trafficking by means of force, threats, fraud, or coercion, in violation of Title 18, United States Code, Sections 1591(a); and (C) conspiracy to commit sex trafficking, in violation of Title 18, United States Code, Section 1594; (hereinafter collectively referred to as the **TARGET OFFENSES**. I am requesting authority to search the **SUBJECT ACCOUNT**, wherein the items specified in Attachment B may be found, and to seize all items listed in Attachment B as instrumentalities, fruits, and evidence of crime, with the Facebook user ID identified on **Attachment A**, information pertaining to the following matters:

  a. The sale or possession of illegal drugs, and the sale, possession, or use of firearms;

  b. Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

  c. Evidence indicating the Facebook account owner's state of mind as it relates to the crimes under investigation;

  d. The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the HSI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.